**Nelson H. SHAPIRO and Richard G. Board**

v.

**FORD MOTOR COMPANY, et al.**
**Civ. No. 71–1329–M.**

United States District Court,
D. Maryland.
May 22, 1973.

Robert H. Rines, Boston, Mass., and Melvin J. Sykes, Baltimore, Md., for plaintiffs.

Norman P. Ramsey and David F. Albright and Semmes, Bowen & Semmes, Baltimore, Md., for defendant Ford Motor Co.

JAMES R. MILLER, Jr., District Judge.

### Memorandum Opinion

In count 3 of the complaint in this case, plaintiffs have alleged, among other things, infringement by Ford Motor Company (hereinafter sometimes termed Ford) of United States Letters Patent No. 3,425,645. Defendant Ford has moved to dismiss count 3 on the ground of improper venue.

The applicable venue statute, 28 U.S. C. § 1400(b), provides as follows:

"Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement *and has a regular and established place of business.*" (emphasis added).

In this case there is no dispute over the fact that Ford does not "reside" in Maryland. Plaintiffs contend, however, that proper venue rests in the District of Maryland because Ford has a "regular and established place of business" in Maryland.

The burden of proving proper venue is clearly upon the plaintiffs. Grantham v. Challenge-Cook Brothers, Inc., 420 F.2d 1182 (7th Cir. 1969).

Preliminarily, there is no doubt that 28 U.S.C. § 1400(b) is the sole and exclusive statutory provision controlling venue in patent infringement cases, Fourco Glass Co. v. Transmirra Prod-

ucts Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), and that the requirement of venue under this section " . . . is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction." Schnell v. Peter Eckrich and Sons, 365 U.S. 260, 81 S.Ct. 557, 5 L. Ed.2d 546 (1961). Furthermore, the test of "regular and established place of business" is a stricter test than the one of merely "doing business." Teledyne Ryan Aeronautical Co. v. Montgomery Ward and Co., 326 F.Supp. 813 (D.Colo. 1971), and cases therein cited.

There is no evidence in this case that Ford itself has any regular and established places of business in Maryland.[1] Plaintiffs argue, however, that venue over Ford can be established through the activities in Maryland of its subsidiaries. Plaintiffs' theory on venue here is that (1) the control exerted by Ford over its various subsidiaries which do have regular and established places of business in Maryland make those subsidiaries merely the "alter ego" of Ford and (2) Ford in carrying on all of its major functions through its Maryland subsidiaries is inducing the infringement in Maryland of the plaintiffs' patent. The court believes that the two theories advanced by the plaintiffs are, under the circumstances of this case, indistinguishable and should be considered together.

A discussion of the issue must start with Cannon Mfg. Co. v. Cudahy Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), a leading case in the area although not a case dealing with patent infringement. The Supreme Court there held that service on a foreign corporation cannot be obtained through service on a wholly owned and dominated subsidiary if the corporate separation between the parent and the subsidiary, although formal only, is real and not fictitious. The test is not the degree of control of the subsidiary by the parent, but rather the extent to which the subsidiary and the parent keep their operations distinct and separate. Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, 269 F.2d 600 (4th Cir. 1959), cert. denied, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed. 2d 156 (1959); Harris v. Deere and Co., 223 F.2d 161 (4th Cir. 1955); see also, American Cyanamid Co. v. Nopco Chem. Co., 388 F.2d 818 (4th Cir. 1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2057, 20 L.Ed.2d 1364 (1968); Holub Ind., Inc. v. Wyche, 290 F.2d 852 (4th Cir. 1961). A resolution of the issue of venue, then, requires the consideration of an extensive set of facts in each case. Cf. Penntube Plastics Co. v. Fluorotex, Inc., 336 F.Supp. 698, 702 (D.S.C.1971). It is necessary in this case to consider the relationship between Ford and its subsidiaries, Ford Marketing Corporation (hereinafter termed Ford Marketing) and Ford Motor Credit Company (hereinafter termed Ford Credit), which may have regular and established places of business in Maryland, as well as the relationship between Ford and its wholly or partially owned dealerships in Maryland, Security Ford Tractor, Inc., and Gateway Ford Tractor, Inc.

The court has considered the extensive affidavits, depositions, and exhibits filed by the parties relative to this motion. Based upon that consideration, the court has made certain factual findings for the purpose of this motion, which findings are set forth in the respective sections of this opinion.

I

Ford Marketing is a wholly owned subsidiary of Ford; it purchases domestically produced vehicles manufactured by Ford and resells them to Ford franchised dealers. Vehicles manufactured by Ford become the property of

---

1. Ford has registered to do business as a foreign corporation in Maryland as have its wholly owned subsidiaries, Ford Marketing Corporation and Ford Motor Credit Company. That fact, standing alone and in isolation, does not establish that it has a regular and established place of business in Maryland.

Ford Marketing as they come off the Ford assembly line, and the sale of such vehicles to dealers is the responsibility of Ford Marketing. There are common directors between Ford and Ford Marketing, and at least one common officer, but Ford Marketing holds its own separate board meetings. Ford Marketing uses the "Ford" trademark in common with Ford and its other subsidiaries. Ford Marketing does not prepare a separate annual report; Ford issues consolidated financial statements which include the accounts of Ford and many of its subsidiaries, including Ford Marketing. Ford Marketing files individual unemployment compensation returns and Maryland corporation income tax returns. Although Ford and its domestic subsidiaries, including Ford Marketing, have common employee benefit plans, each participant subsidiary of Ford, including Ford Marketing, contributes its relative share of the cost of the benefit plans. Ford Marketing has an independently adopted and administered arbitration agreement with Ford dealers and Lincoln-Mercury dealers and negotiates in its own name the Ford sales and service agreement with Ford dealers. Ford Marketing maintains independent financial records of all sales transactions with Ford, maintains bank accounts in its own name, pays its employees with checks drawn on its own bank accounts, owns or leases in its own name all its office facilities, and maintains separate business records from Ford at Ford Marketing headquarters. Ford Marketing pays its own operating expenses and has a validly issued corporation charter which has never been revoked. Ford Marketing buys accessories and repair parts from Ford and other suppliers although its purchasing decisions are limited by the choice of original equipment placed on the cars by Ford. Under a consent decree entered against Ford in a United States District Court in 1959, Ford Marketing is prohibited from encouraging Ford dealers to use Ford Credit.

Ford Marketing maintains an office and one employee in Maryland. It maintains an inventory of glass and batteries in Maryland and from time to time has possession in Maryland of damaged vehicles refused by Ford dealers in Maryland. Ford Marketing also maintains in Maryland inventories of imported vehicles pending their distribution to dealers. Ford Marketing has registered to do business as a foreign corporation in Maryland.

## II

Ford Credit is a wholly owned subsidiary of Ford. Ford Credit was formed by Ford to provide financial assistance to Ford dealers as well as to engage in the general finance business. Of the receivables of Ford Credit, 10% or approximately Four Hundred Sixty-Five Million Dollars ($465,000,000) represents loans on airplanes, construction, flight simulators, apartment houses, and other items exclusive of Ford products. In 1971 Ford Credit financed non-Ford consumer loans to be used for any purpose in the amount of Thirty-Nine Million Dollars ($39,000,000). In 1971 five out of 11 of the directors of Ford Credit also sat on the board of Ford, but Ford Credit held its own separate board meetings. Ford Credit uses the "Ford" trademark in common with Ford and its other subsidiaries although its logo more prominently displays the word "Credit" than it does the word "Ford." Ford Credit provides dealers with capital loans, working capital, loans for dealership facilities, and mortgage loans. Substantially all of the dealers serviced by Ford Credit are Ford dealers and about 90 to 95% of the retail sales financing conducted by Ford Credit on new cars is on Ford cars. Ford Credit issues its own annual report, but Ford includes Ford Credit in Ford's consolidated financial statements in its own annual report. Ford Credit employees are generally covered by common employee benefit plans in conjunction with Ford and its subsidiaries, but Ford

Credit pays its pro rata share of the cost of said plans. Ford dealers are not required to use Ford Credit financing and the majority do not use such financing. Under the consent decree entered into by Ford in 1959, Ford and its other subsidiaries may not coerce or influence a dealer to patronize Ford Credit or any other particular finance company. Many Ford dealerships display decals of financing companies other than Credit, such as C.I.T., Public Commercial Credit, and others. Non-Ford investment decisions of Ford Credit are made by the Board of Directors of Ford Credit and its employees. No recommendations are made by Ford Marketing to Ford Credit regarding loans to Ford dealers. Upon application to Ford Credit for a loan by a Ford dealer, Ford Credit evaluates the dealer independently of Ford in determining whether it wants to extend financing to that dealer. Approval of floor plan financing of dealers is done by Ford Credit personnel. Where credit has been extended by Ford Credit to a Ford dealer, the billing procedure between Ford Marketing and Ford Credit is the same as with any other commercial finance company. An agreement between Ford Credit, Ford Marketing, and Ford provides for payments to the extent required from Ford Marketing to Ford Credit to maintain the minimum gross income of Ford Credit before income taxes at a level of 2% on an annualized basis of "invested capital," said payment being guaranteed by Ford. No payments were required to be made by either Ford Marketing or Ford under that agreement in 1970 or 1971. Ford made contributions to the capital of Ford Credit in the amount of Fifty Million Dollars ($50,000,000) in June, 1969, and March, 1970, and One Hundred Million Dollars ($100,000,000) in December, 1961 and October, 1970. In December, 1966, ownership of the American Road Insurance Company and its wholly owned subsidiary, Ford Life Insurance Company, was transferred to Ford Credit by Ford. In September, 1971, Ford contributed to Ford Credit the owner-

ship of Ford Motor Credit Company of Canada, Ltd. Export drafts past due to Ford Credit for dealer wholesale financing are guaranteed by Ford, but this represents approximately .029% of the consolidated receivables of Ford Credit past due 60 days or more. Convertible debentures offered to the public by Ford Credit are convertible into Ford stock with the conversion privilege being guaranteed by Ford. By agreement dated February 5, 1970, Ford waived stated interest of 9.35% per year on a note payable by Ford Credit so that the latter could continue to show profits and maintain its borrowing position when money was tight; but the note involved in the amount of Forty Million Dollars ($40,000,000) was prepaid by Ford Credit on November 30, 1970. An agreement between Ford Credit and Ford Marketing provides for subordination of One Hundred Million Dollars ($100,000,000) of vehicle accounts, payable to Ford Marketing, for the purpose of allowing additional debt financing to be obtained by Ford Credit. While Ford and Ford Credit file consolidated federal tax returns, Ford Credit pays its share of such taxes and allocates to its subsidiaries their respective shares. Ford Credit made two debenture offerings of long-term debt in 1970 on its own credit, the first involving One Hundred Fifty Million Dollars ($150,000,000) and the second involving Two Hundred Million Dollars ($200,000,000). Ford Credit keeps separate corporate business and accounting records from Ford and has its own Board of Director meetings. Ford Credit pays its operating expenses with its own funds and leases its buildings and equipment in its own name. Ford Credit maintains separate bank accounts in its own name and pays its employees from these accounts. Ford Credit earned a profit in 1971 of Thirty-Seven Million Dollars ($37,000,000). It has a validly issued corporate charter which has never been revoked and files individual unemployment compensation returns and Maryland corporation income tax returns. No personnel of Ford

use the offices of Ford Credit in Maryland.

### III

Ford Leasing, American Road Insurance, and Ford Life Insurance are subsidiaries of Ford Credit. Ford Leasing, on the basis of information supplied by Ford Marketing Corporation, acquires property in a market area where Ford Motor Company dealer representation is needed. Ford Leasing then plans the physical facilities and leases them to a dealer. Ford Motor Credit Company offers a complete finance and insurance record system to Ford dealers and attempts to induce the dealer to utilize the American Road Insurance Company and the Ford Life Insurance Company for insurance services.

### IV

The evidence discloses for the purpose of this motion that there are 12 Ford dealerships and one leasing company which operate in Maryland and which are owned in whole or in part by either Ford Marketing Corporation or Ford Motor Company itself. The two Maryland dealerships which Ford owns an interest in are Security Ford Tractor, Inc. and Gateway Ford Tractor, Inc., one of which is wholly owned by Ford. Security and Gateway are duly incorporated under the laws of Delaware and their charters have never been revoked. They keep separate corporate business and accounting records from Ford Motor Company and keep separate records of their sales transactions with Ford Motor Company. Gateway and Security employ their own personnel, maintain separate bank accounts in their own name, pay their employees from their own bank accounts, file separate tax returns, pay their individual operating expenses with their own funds, lease in their own names the buildings and equipment which they use, and have their own Board of Director meetings.

### V

The operations of Ford Leasing, American Road Insurance, and Ford Life Insurance which are subsidiaries of Ford Credit, and the Maryland dealerships and leasing company which are wholly or partially owned subsidiaries of Ford Marketing, will not be separately analyzed in this opinion since proper venue as to Ford Motor Company through them should be tested by whether there is proper venue as to Ford through Ford Credit or Ford Marketing respectively. There is no evidence that these lesser subsidiaries are agents for Ford Motor Company.

### VI

The facts as to the operations of Ford Marketing, Ford Credit, and Security and Gateway closely resemble those in Harris v. Deere and Company, *supra,* and Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, *supra.* In those cases the Fourth Circuit reluctantly found that the defendants in question had been properly dismissed for lack of jurisdiction as not "doing business" in the forum state in *Harris v. Deere and Company* and for lack of venue as not having a "regular and established place of business" in the forum state under 28 U.S.C. § 1400(b) in *Manville Boiler Co.* In this case as in those, despite the potential or actual control exercised by Ford Motor Company, the separate corporate entity of each subsidiary is strictly observed. The fact that in some instances combined financial statements of Ford Motor Company and some of its subsidiaries are published in its annual reports and that a consolidated federal income tax return is filed does not overweigh the otherwise strict adherence to the formal separateness of Ford and its subsidiaries. See Harris v. Deere and Company, *supra,* 223 F.2d at 162.

Plaintiffs rely heavily upon Industrial Research Corp. v. General Motors Corp., 29 F.2d 623 (N.D.Ohio 1928), which held venue to be proper as to General Motors through certain of its subsidiaries. In that case, contrary to the situation here, the defendant parent corporation did not factually contest the allegations that the subsidiaries acted as

mere agents of the parent. To the extent, however, that Industrial Research Corp. v. General Motors Corp., *supra,* stands for the proposition that venue under 28 U.S.C. § 1400(b) can be obtained over a parent corporation through a wholly owned and controlled subsidiary which is formally separate but which carries on the sales and related activities of the manufacturing parent, the case is in conflict with the controlling authority of this circuit, notably the *Manville Boiler, supra,* case.

In the *Manville Boiler* case, the Fourth Circuit found that the local Virginia corporation's stock was owned by the stockholders of the parent corporation (Columbia) and was extensively controlled by Columbia, or its stockholders in Pottstown, Pennsylvania. The court went on:

"Though there was advertising matter referring to the office of the Virginia corporation as a factory branch and Columbia's home office in Pottstown as its offices and factory, suggesting a unitary business, the operations of the two corporations were kept distinct and separate. The Virginia corporation was treated as a separate entity, though its policies and activities were directed from Pottstown. Columbia sold boilers to the Virginia corporation, which paid for them, usually promptly, and resold them to customers in Virginia. Columbia did not service boilers sold by the Virginia corporation to Virginia customers, and it can be held to have a regular and established place of business in Virginia only by treating the office of the Virginia corporation as Columbia's regular and established place of business.

"Decision on the venue question is controlled by Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634. If the rule of that case unduly emphasizes the form in which related corporations cast their intercorporate transactions and minimizes the control ex-

ercised by the one of the other, the rule, nevertheless, is well established." 269 F.2d at 606.

The facts here differ markedly from those in *Penntube Plastics, supra* (336 F.Supp. at 701), where the district court found venue over a parent to be proper through a subsidiary when the two entities lacked formal separateness.

It is true that in the present case Ford filed a registration form as a foreign corporation authorized to do business in Maryland in which it stated in answer to a question "nature of business conducted in Maryland" as follows:

"The manufacture, assembly and sale of passenger cars and trucks and their related parts and accessories constitute the principal business of the Company."

Plaintiffs argue that this statement can be rationalized only by viewing the entire operation of Ford and its subsidiaries in bringing motor vehicles to the marketplace in Maryland. This, say the plaintiffs, shows that the Ford operation is a unitary one, even though various parts of the operation are carried out by subsidiaries. To this there are several answers.

First, it is not contended that Ford or any of its subsidiaries manufacture or assemble any motor vehicles in Maryland. Therefore the quoted language in the corporate registration form would seem to be overly expansive and relate to the business of Ford in general rather than to the business of Ford in Maryland.

Second, it is absolutely true even under Ford's theory of the case on this motion that Ford has as a part of its business the ". . . sale of passenger cars and trucks and their related parts and accessories . . . ." Ford contends, and the evidence establishes, that it sells these items to Ford Marketing which then sells them to Ford dealers who then hopefully sell them to the general public. The fact that some or all of these sales take place in Maryland is inconsequential unless Ford has (either di-

rectly or through an alter ego or agent) a regular and established place of business in Maryland. Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, *supra*.

 Third, even if the "sale" language of the corporate registration form refers to the sale of motor vehicles to Ford dealers or to the general public, such an interpretation is of no help to the plaintiffs under the facts here. The Fourth Circuit has held that even where there is a unitary business purpose to manufacture and sell to ultimate consumers, if the operations of the two or more functional components of that unitary business purpose are themselves vested in formally separate entities, then venue over one under § 1400(b) cannot be gained by treating the regular and established place of business of the other as the office of the former. *Manville Boiler Co., id.* Other courts have reached similar conclusions. Teledyne Ryan Aeronautical Co. v. Montgomery Ward & Co., *supra*; Scaramucci v. F. M. C. Corporation, 258 F.Supp. 598 (W.D. Okl.1966).

While recognizing that some courts have reached a different conclusion on similar facts, Appleton v. Ronson Service of Ill., Inc., 297 F.Supp. 868 (N.D. Ill.1968); GAF Corp. v. Hanimex Corp., 294 F.Supp. 495 (N.D.Ill.1968), it is my view that the weight of authority in this circuit compels the conclusion that under the facts here found to be present venue over Ford cannot be found through the regular and established places of business in Maryland of Ford's subsidiaries.

### VII

In view of this conclusion it is not necessary to decide the disputed issue of whether Ford Marketing in fact has a regular and established place of business in Maryland.

For the reasons set forth herein an order will be entered dismissing count 3 as to Ford Motor Company for lack of venue unless within twenty (20) days of the filing date of this Opinion a motion is made to transfer this case to another district under 28 U.S.C. § 1404(a) or § 1406(a) in which event further proceedings as required will be scheduled.