**FIELDCREST MILLS, INC., Plaintiff,**

v.

**MOHASCO CORPORATION (formerly Mohasco Industries, Inc.) and Edgar Pickering (Blackburn), Limited, Defendants.**

**No. C–75–220–G.**

United States District Court,
M. D. North Carolina,
Greensboro Division.

Dec. 15, 1977.

David M. Moore, II, Greensboro, N. C., and Robert E. Payne, Richmond, Va., for plaintiff.

Thornton Brooks and James T. Williams, Jr., Greensboro, N. C., for defendant Mohasco.

William B. Rector, Jr., Greensboro, N. C., for defendant Pickering.

## MEMORANDUM AND ORDER

GORDON, Chief Judge.

This case arises out of a sale of textile machinery to the plaintiff, Fieldcrest Mills, Inc. (Fieldcrest), a manufacturer of carpet and other textiles whose principal place of business is in Eden, North Carolina. The defendant Mohasco Corp. (Mohasco) is a New York corporation which holds patents on the textile machinery involved in this case. The defendant Edgar Pickering (Blackburn) Ltd. (Pickering-England) is a British corporation which has been licensed by Mohasco to manufacture and distribute these patented machines. In 1971–72, Fieldcrest entered into contracts with Mohasco and Edgar Pickering, Inc. (Pickering-America) for the licensing, sale, and installation of the textile machinery involved in this case. Pickering-America is a Tennessee corporation which is a subsidiary of Pickering-England.

Fieldcrest seeks recovery of a judgment *in personam* against both defendants, jointly and severally, claiming false and fraudulent misrepresentations by Mohasco and Pickering-England induced Fieldcrest to purchase these machines. Fieldcrest also charges defendants with unjust enrichment, negligence, breach of implied and express

warranties, and acts in violation of N. C. General Statute § 75–1.1 *et seq.* Subject matter jurisdiction is founded on diversity of citizenship. The amount in controversy exceeds $10,000.00.

Before answering, Pickering-England moved to dismiss the claims against it for lack of personal jurisdiction. Extensive discovery on this issue has been conducted pursuant to several orders of this Court. The matter is now before the Court for decision. For the reasons set out below, Pickering-England's motion is denied.

■ To resolve the question of personal jurisdiction, the Court must engage in a two step examination. First, the Court must determine if the applicable state law would allow the exercise of jurisdiction over Pickering-England. If the answer to this inquiry is yes, the Court must then determine if the exercise of jurisdiction in this case comports with due process. *Bowman v. Curt G. Joa, Inc.,* 361 F.2d 706 (4th Cir. 1966); *United Advertising Agency v. Robb,* 391 F.Supp. 626 (M.D.N.C.1975).

Fieldcrest contends that Pickering-England committed various acts which fall within a jurisdictional section of the N. C. Business Corporation Act, N.C.Gen.Stat. § 55–145, and within several subsections of North Carolina's general long-arm statute, N.C.Gen.Stat. § 1–75.4. The Court's task in determining whether there is a North Carolina statute applicable to this case is simplified by the recent holding involving N.C. Gen.Stat. § 1–75.4(1)(d) in *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 231 S.E.2d 629 (1977). Section 1–75.4(1)(d) provides for personal jurisdiction over all persons who are "engaged in substantial activity within this State." Fieldcrest contends § 1–75.4(1)(d) is applicable here. In *Dillon,* the N. C. Supreme Court read this subsection to apply to any defendant who meets the minimum contacts requirement of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Accordingly, the question of whether there exists statutory authority for the exercise of jurisdiction over Pickering-England collapses into the question of whether Picker-

ing-England has the minimum contacts with North Carolina necessary to comport with due process. It is unnecessary to decide whether N.C.Gen.Stat. § 55–145 or the other subsections of N.C.Gen.Stat. § 1–75.4 cover the situation presented in this case.

### Due Process

Fieldcrest asserts that personal jurisdiction over Pickering-England would be proper in this Court on either of two theories. The first is that Pickering-England's own contacts with North Carolina are sufficient to establish personal jurisdiction in this state. Second, Fieldcrest contends that the contacts of Pickering-America, which are clearly sufficient for personal jurisdiction over that company, should be attributed to its parent, Pickering-England.

### Pickering-England's Direct Contacts

Fieldcrest contends that Pickering-England has sufficient contacts with North Carolina to satisfy due process because of its acts involving the sale of the machinery to Fieldcrest and because of its other solicitation activities in North Carolina. A fuller exploration of the facts of this case is required to evaluate Fieldcrest's contentions.

In December, 1970, Pickering-England and Mohasco concluded a license agreement by which Pickering-England acquired worldwide rights to manufacture and sell carpet tufting and dyeing machines (hereinafter referred to as the Crawford machinery), on which Mohasco held patents. Shortly after Pickering-England secured the right to manufacture and sell these machines, it began promoting the machinery and soliciting sales.

On or about February 16, 1971, Pickering-England sent Fieldcrest a letter and brochure promoting the Crawford machinery. The letter suggested that the recipient contact "[o]ur Vice President Overseas . . . Max M. Beasley" in Chattanooga, Tennessee. At the time of Pickering-England's solicitation, Pickering-America was not yet in existence. On April 14, 1971, a month prior to the incorporation of Pickering-

America, Beasley wrote Fieldcrest enclosing a price quotation and specifications for the Crawford machinery. Pickering-England had prepared the specification sheet in England, on its own letterhead.

In May, 1971, Pickering-America was incorporated in the State of Tennessee as a ninety-five per cent owned subsidiary of Pickering-England. Max M. Beasley was named president of the company. Edgar Pickering became chairman of the board of directors. Frank Farley was named vice president of Pickering-America. Pickering, Beasley, and Farley constituted the entire board of Pickering-America. At the time, Pickering and Farley were, respectively, managing director and deputy chairman of Pickering-England.

With the incorporation of Pickering-America, the facts of this case become muddied. Fieldcrest and Pickering-England strongly contest each other's description of subsequent events and the official identities of the actors in those events. Pickering-England asserts that the additional contacts Fieldcrest claims the British corporation had with North Carolina were actually attributable to individuals who were acting as officials and employees of Pickering-America and another Pickering-England subsidiary, Pickering Locstitch, Ltd. Fieldcrest, on the other hand, contends that these individuals were acting as agents and employees of Pickering-England. The Court accepts the plaintiff's version of the disputed facts for purposes of deciding this motion. No opinion on the complete accuracy of the plaintiff's allegations is expressed.

The following is an abbreviated summary of Fieldcrest's factual contentions which the Court has extracted from the plaintiff's lengthy submissions in opposition to the defendant's motion:

1. Fieldcrest contends that officers and employees of Pickering-England actively engaged in soliciting and negotiating the contract for the Crawford machines. These negotiations included a visit to North Carolina in August 1971, by Edgar Pickering, as chief executive officer of Pickering-England, to persuade Fieldcrest to purchase the machinery. During the installation of the Crawford machines, Pickering-England employees were in almost daily communication with Pickering-America regarding the installation and at times were present at the installation site in North Carolina.

2. Fieldcrest also contends that Pickering-England, in addition to its contacts with Fieldcrest, has over a period of years solicited sales from other North Carolina manufacturers. Specifically, during 1971, Beasley procured, as agent for Pickering-England, a contract with Burlington Industries, Inc. of North Carolina. This contract was subsequently cancelled. Again in 1972, Pickering-England solicited sales from Burlington Industries in Greensboro, North Carolina, on three occasions. From 1972 to 1976, Pickering-England had occasional contacts, including a personal visit by Edgar Pickering and Frank Farley, with Cannon Mills of Kannapolis, North Carolina. These contacts resulted in a contract in 1976 to place a "locstitch" machine in one of Cannon's North Carolina plants. This contract was concluded with another Pickering-England subsidiary, Pickering-Locstitch, Ltd.

3. In addition, Fieldcrest contends that over the last five years, Pickering-England has promoted sales of textile machinery by advertising in magazines that circulated among North Carolina textile manufacturers.

In *McCoy Lumber Industries, Inc. v. Niedermeyer-Martin Co.*, 356 F.Supp. 1221 (M.D.N.C.1973), this Court adopted the general principles set forth by Justice (then Judge) Blackmun in *Aftanase v. Economy Baler Co.*, 343 F.2d 187 (8th Cir. 1965) as criteria for analyzing whether minimum contacts are present. There criteria include:

"[T]hree primary factors, namely, the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts . . . and two others, interest of the forum state and convenience . . . ." 343 F.2d at 197.

The quantity of contacts which Pickering-England had with North Carolina, while not overwhelming, is substantial when the plaintiff's version of the facts is adopted. Since 1971, high officials in Pickering-England have communicated with North Carolina textile manufacturers in attempting to solicit sales. These contacts have included personal visits to North Carolina, in connection with the Fieldcrest and Cannon contract negotiations. Pickering-England also engaged in mass solicitations which reached North Carolina textile firms. In addition, during installation of the Crawford machines at the Fieldcrest plant, Pickering-England employees and officials were in frequent communication regarding the installation.

As for nature and quality of the contacts, the Fieldcrest contract, which Pickering-England helped negotiate and allegedly helped to implement, involved a purchase in excess of $400,000.00 The Burlington and Cannon Mills negotiations also involved large sums.

In cases of contract disputes, the source and connection of the cause of action with the defendant's contacts with the forum state can usually be judged using principles evolved from *McGee v. International Life Insurance*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). *See United Advertising Agency, Inc. v. Robb*, 391 F.Supp. 626, 630–31 (M.D.N.C.1975). In these cases the touchstone in ascertaining the strength of the connection between the cause of action and the defendant's contacts is whether the cause arises out of attempts by the defendant to benefit from the laws of the forum state by entering the market in the forum state. This principle is useful in the present case despite the fact that this case lies outside of the mainstream of contract disputes since Pickering-England is not a signatory to the sales contract. When the plaintiff's version of the fact is accepted, it can be seen that the various causes of action in this case—breach of warranty, negligence, misrepresentation, and unfair and deceptive practices—arise out of Pickering-England's attempts to enter and exploit the textile machinery market in North Carolina. As such, there is a strong connection between the causes of action and Pickering-England's various contacts with this state.

Consideration of the final two factors, interest of the forum state and convenience, does not warrant a change in the decision to accept jurisdiction. Any state has a general interest in providing a forum for its residents to settle disputes in which they are involved. North Carolina has a strong interest in providing a forum in this case since much of the negotiations of the Fieldcrest contract and nearly all of the performance of the contract took place in this state. North Carolina's interest is certainly greater than the interest of other jurisdictions such as Great Britain or Tennessee where personal jurisdiction would presumably exist over Pickering-England but might not exist over Mohasco. As for convenience, while most of the defendants' witnesses would not be from North Carolina, most of the plaintiff's witnesses would be from this state.

In sum, the above examination of Pickering-England's own contacts with North Carolina demonstrates that maintenance of this suit against Pickering-England does not "offend traditional notions of fair play and substantial justice" so as to violate due process.

### Attributing Pickering-America's Acts to Pickering-England

As an alternative basis for jurisdiction over Pickering-England, Fieldcrest argues that Pickering-America's contacts with North Carolina are attributable to Pickering-England in order to establish minimum contacts. Pickering-England has relied heavily on the 1925 Supreme Court decision in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), in arguing that it should not be subject to personal jurisdiction in North Carolina on the basis of the activities of Pickering-America. In response, Fieldcrest contends that this case falls within two exceptions to *Cannon* because Pickering-America was acting as an "alter ego" of

Pickering-England and was participating in a joint venture with Pickering-England in soliciting and performing the Fieldcrest contract.

*Cannon* is a watershed case widely cited for the proposition that the acts of a subsidiary will not subject the foreign parent to the jurisdiction of the state where the subsidiary is doing business. In *Cannon*, the parent corporation dominated its subsidiary through complete stock ownership but formal corporate separateness was carefully maintained. Later decisions applying *Cannon* have occasionally held a parent corporation amenable to personal jurisdiction but have more commonly ruled that there was no personal jurisdiction over the parent corporation.[1] Characteristic of the cases applying *Cannon* has been an intensive investigation of the relationship between the parent and subsidiary corporations to determine whether the subsidiary acted as "alter ego" of the parent.

*Cannon* could be easily distinguished from the case at hand on the basis that *Cannon* involved no question of the constitutional powers of the state or federal governments but was merely the Supreme Court's interpretation of what activities constituted "doing business" with a forum and thus involved the concept of "presence" and not the less rigid "minimum contacts" test of *International Shoe*.[2] Despite this, Pickering-England contends that *Cannon* has continuing vitality in the post-*International Shoe* era and cites two Fourth Circuit decisions in support of its assertion.

The first is the decision in *Harris v. Deere and Company*, 223 F.2d 161 (4th Cir. 1955) (per curiam), in which the Fourth Circuit reluctantly followed *Cannon* in applying the "doing business" test which was then the jurisdictional test under North Carolina's Business Corporation Act:

"Much can be said in support of the view that a manufacturer which distributes its product by selling it to a wholly owned and completely controlled subsidiary, should, for purposes of jurisdiction in the courts, be held to be doing business wherever the subsidiary sells the product. The fiction of different corporate entities ought not permit the manufacturer, in such case, to avoid suit in the states where its product is being sold and where the wholly owned and controlled subsidiary is representing it just as truly as if it were an agent in the legal sense; and we would so hold if we felt ourselves at liberty to do so. It is not for us, however, to overrule or modify decisions of the Supreme Court; and until the doctrine of the line of cases to which we have referred is overruled or modified, it cannot be said that a corporation is doing business within a state merely because a wholly owned and controlled subsidiary is selling its product there, if the separate corporate entities are observed and the subsidiary has purchased the goods which it is selling and is not selling them as agent of the manufacturer."

The second case cited by Pickering-England is *Manville Boiler Company v. Columbia Boiler Company of Pottstown*, 269 F.2d 600 (4th Cir. 1959) which involved the determination of what was proper venue in a patent infringement action. In a patent infringement case, venue lies only where a corporation has a "regular and established place of business." The Fourth Circuit ruled in *Manville* that since the "regular and established place of business" test is a more rigorous test than the "doing business" test, *Cannon* necessarily barred a finding that a parent corporation had a place of business in Virginia solely due to its subsidiary having a place of business in that state.

---

1. *See e. g., Mas v. Orange-Crush Co.*, 99 F.2d 675 (4th Cir. 1938) (finding jurisdiction); *Harris v. Deere and Co.*, 223 F.2d 161 (4th Cir. 1955) (no jurisdiction); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974) (no jurisdiction).

2. For a history of the transition from the use of the concepts of "presence" and "consent" to the "minimum contacts" test, see Wright and Miller, Federal Practice and Procedure, Civil §§ 1066 and 1067; 2 Moore's Federal Practice 1148–64 (1977).

The Fourth Circuit's decision in *Manville* clearly is not relevant to the case at hand where this Court must apply the less rigid "minimum contacts" test. Like the Fourth Circuit in *Harris* the Court feels that there is much to be said in support of holding a corporation amenable to the jurisdiction of a court in a state where the manufacturer distributes its product through a subsidiary. However, because jurisdiction in this case is asserted under a statute which is broader than the "doing business" test, this Court does not face the dilemma the court in *Harris* faced. This case is not controlled by the *Cannon* decision and the Court will not extend the reach of *Cannon* beyond the area to which it is now confined without good reason.[3]

Rejection of the *Cannon* rule does not mean that in all cases the acts of a subsidiary corporation will be attributed to the parent corporation for the purposes of establishing jurisdiction over the parent. Even under the minimum contacts test, the mere fact of stock ownership is not sufficient to bring the parent within the court's jurisdiction. Outside the *Cannon* line of cases, the Court is not aware of any developed set of standards to apply in determining what situations warrant asserting jurisdiction over a parent corporation. While the Court is not prepared to set out a comprehensive standard with which to judge jurisdictional questions in this context, the Court is of the opinion that guidance can be taken from previous decisions in this Circuit applying the minimum contacts test. In doing so, the Court is of the hope that applying the minimum contacts test will require a less exhausting analysis than that required under the *Cannon* line of cases.

Particularly important of the decisions in the Fourth Circuit is *Hardy v. Pioneer Parachute Co., Inc.*, 531 F.2d 193 (4th Cir. 1976), where a South Carolina plaintiff sued a Connecticut manufacturer of parachutes (Pioneer) and its Massachusetts distributor (Parachutes), an unrelated corporation. Pioneer had "occasionally" made direct sales to South Carolina but sold its products mainly through Parachutes, its exclusive distributor. Parachutes' contacts with South Carolina consisted of forty-two direct sales to South Carolina customers over a period of several years and advertising in two national magazines that reached South Carolina readers. Pioneer contributed to Parachutes' advertising budget which presumably helped underwrite these advertisements. Pioneer owned no property in South Carolina, had no agents, employees or office in the state, and paid no taxes there. The Fourth Circuit held both corporations subject to personal jurisdiction in South Carolina. Since Pioneer's direct contacts with the forum state were minimal, the apparent rationale of *Hardy* is that the manufacturer-distributor relationship permitted Parachute's contacts with the state to be attributed to Pioneer where Parachute's contacts with South Carolina originated in its activities to promote and distribute Pioneer's products.

The Court believes that the business relationship between Pickering-England and Pickering-America to be sufficiently analogous to the manufacturer-distributor relationship in *Hardy* to be covered by the logic of that case. Fieldcrest alleges, and has produced evidence which tends to show, that Pickering-England created Pickering-America to advertise, promote, sell and install its textile machines in this country. Among the facts which make plausible the existence of a manufacturer-distributor relationship in this case are the heretofore mentioned events concerning Pickering-England's direct contacts with Fieldcrest and the subsequent establishment of Pickering-America. In addition to these facts, the licensing arrangement between Mohasco and Pickering-England which would re-

---

**3.** In recent years, courts which were applying jurisdictional tests less restrictive than the doing business test have frequently exercised jurisdiction over a corporation on the basis of its subsidiary's acts. *See e. g., Boryk v. deHavil-* *land Aircraft Co., Ltd.*, 341 F.2d 666 (2d Cir. 1965); *Tokyo Boeki (U.S.A.), Inc., v. SS Navarino*, 324 F.Supp. 361 (S.D.N.Y.1971); *Hitt v. Nissan Motor Company, Ltd.*, 399 F.Supp. 838 (S.D.Fla.1975).

turn to Pickering-England a portion of the royalties paid by Fieldcrest further supports the existence of a relationship analogous to manufacturer-distributor. Furthermore, the similarity between this case and *Hardy* is strengthened by the advertising practices of Pickering-England and Pickering-America. If anything, the relationship between the two Pickering companies was closer than the Pioneer-Parachute relationship in *Hardy*. It would be a curious circumstance if a corporation that used a subsidiary to distribute its products was less amenable to a court's jurisdiction than a manufacturer that used an unrelated corporation to distribute its products. While a corporation will not always be subject to jurisdiction in a forum with which its subsidiary has contacts, on the facts of this case, Pickering-England should be subject to personal jurisdiction in North Carolina.

### Conclusion

The Court finds Pickering-England to be amenable to personal jurisdiction in North Carolina on either of two grounds. On the facts as taken for purposes of the motion to dismiss, Pickering-England's direct contacts with North Carolina are sufficient to support the exercise of personal jurisdiction over it. The Court finds it unnecessary to consider the plaintiff's contention that this case falls within exceptions to the *Cannon* rule. Instead, the Court finds *Cannon* to be inapplicable to jurisdictional questions involving the minimum contacts test. The relationship between Pickering-England and Pickering-America is sufficiently analogous to that of a manufacturer and distributor to permit Pickering-America's contacts with North Carolina to be attributed to Pickering-England. These contacts are sufficient to form an alternative basis for jurisdiction over Pickering-England.

For the foregoing reasons, the defendant's motion to dismiss is denied.

Therefore, it is ORDERED that the defendant's motion be, and the same is hereby, denied.