The FINANCE COMPANY
OF AMERICA

v.

BANKAMERICA CORPORATION et al.

Civ. No. Y–79–1959.

United States District Court,
D. Maryland.

July 1, 1980.

Paul M. Vettori, Baltimore, Md., for plaintiff; Alfred H. Moses, Washington, D. C., and Gary R. Roberts, Washington, D. C., of counsel.

David F. Albright, Franklin T. Caudill, William L. Hallam, Baltimore, Md., for defendants; Milton W. Schlemmer, and Nancy E. Martin, San Francisco, Cal., of counsel.

JOSEPH H. YOUNG, District Judge.

Plaintiff, the Finance Company of America (FCA) has brought suit under the Lanham Act, 15 U.S.C. § 1051, *et seq.* alleging that defendants' use of the trade name and service mark "FINANCEAMERICA" (or "FinanceAmerica") constitutes a false representation of services in interstate commerce and also violates state law. The defendants in this case are BankAmerica Corporation (FinanceAmerica-parent), its wholly owned subsidiary, and FinanceAmerica Corporation (FinanceAmerica-Maryland), and FinanceAmerica Private Brands, Inc. which are in turn wholly owned subsidiaries of FinanceAmerica-parent. FinanceAmerica Commercial Corporation, which was originally a defendant, changed its corporate name to BA Business Credit Corporation, thus prompting plaintiff to move for dismissal without prejudice of its claim against that corporation. In addition, plaintiff has indicated its intention to add as a defendant FinanceAmerica Capital Corporation, another subsidiary of FinanceAmerica-parent.

Personal jurisdiction over FinanceAmerica-Maryland is conceded. The other defendants have filed motions to dismiss claiming this Court lacks personal jurisdiction over them. In the alternative, the defendants argue that venue is improper. After reviewing the briefs of counsel, as well as the materials submitted in support of jurisdiction, this Court has concluded that there is personal jurisdiction over the defendants and that venue is proper.

*Selecting a Standard for Deciding the Personal Jurisdiction Question.*

The parties have assumed that state law governs the personal jurisdiction inquiry. Although this appears to be the rule in this Circuit, *Gkiafis v. Steamship Yiosonas,* 342 F.2d 546 (4th Cir. 1965), it has not received universal endorsement and therefore warrants some reexamination.

Congress has not provided for nationwide service of process. Rather, in cases in which a defendant does not have an agent within the state, Fed.R.Civ.P. 4(d)(7) authorizes service of process in any manner authorized by the law of the state in which the district court is located. But, as noted in an early case also arising under the Lanham Act, the rule "sanctions service on a foreign corporation by the *method* prescribed by the forum state law. There is, however, no such unanimity of opinion on the question of whether *amenability* to process is to be determined by applying state standards as they are limited by concepts of due process, or by applying federal 'general law' concepts." *Bar's Leaks Western, Inc. v. Pollock,* 148 F.Supp. 710, 712 (N.D.Cal.1957) (footnotes omitted). In general, federal courts have decided in diversity cases that "the policy underlying the doctrine of intra-state uniformity . . . seems to require the application of state standards . . . ." *Id. See also United States v. First National City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); and *Arrowsmith v. U.P.I,* 320 F.2d 219 (2d Cir. 1963). A number of courts have noted that this policy is absent in federal question cases. *See, e. g., Bar's Leaks, supra,* at 713; *Arrowsmith, supra,* at 228, n.9. Moreover, application of state standards in such cases engenders the anomalous result "that the jurisdiction of federal courts dealing with federal questions will vary from state to

state." *Gkiafis, supra,* at 549. *See also PPS, Inc. v. Jewelry Sales Representatives, Inc.,* 392 F.Supp. 375 (S.D.N.Y.1975). Nevertheless, most federal courts have applied state standards in deciding personal jurisdiction issues in federal question cases. *See, e. g., Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546 (10th Cir. 1967); and *Honda Associates, Inc. v. Nozawa Trading, Inc.,* 374 F.Supp. 886 (S.D.N.Y. 1974). Some courts, however, have adopted a federal standard. *See e. g., PPS, Inc., supra; Edward J. Moriarty & Co. v. General Tire & Rubber Co.,* 289 F.Supp. 381 (S.D. Ohio 1967).

■ In sum, it would appear that application of a federal standard would be more sensible. The venue statute would seem to provide adequate safeguards against vexatious lawsuits. Reliance on the venue statute, 28 U.S.C. § 1391, which provides that suits may be brought in the district in which the claim arose, would foreclose the possibility which exists in the present scheme that all defendants might not be subject to suit in the same district. This Court, however, feels compelled to follow the rule in this Circuit. Therefore, the Maryland Long-Arm Statute, Md.Cts. & Jud.Proc.Code Ann. § 6–103 governs the inquiry in this case.

*Which Provisions of the Long-Arm Statute May be Considered in This Case.*

■ In its complaint, plaintiff did not specify the subsection of the Long-Arm Statute on which it intended to reply. Rather, it alleged that each of the defendants "transacts business and/or performs financial services in the State of Maryland." With the exception of the acts constituting the alleged infringement, the plaintiff also did not allege with any specificity the defendants' contacts with the forum state. It is defendants' contention that plaintiff is limited to proving jurisdiction under § 6–103(b)(1) which provides that "[a] court may exercise personal jurisdiction over a person, who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State

. . . ." Defendants base this contention on the ground that "[t]he complaint must state on its face the grounds for the Court's jurisdiction." *Haynes v. James H. Carr, Inc.,* 307 F.Supp. 1228, 1230 (E.D.Va.1969), aff'd 427 F.2d 700 (4th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970). Although this language would appear to support defendants' contention, *Haynes* did not deal with a situation in which the jurisdictional facts proved did not correspond to those alleged as is true in the instant case. Rather, *Haynes* dealt primarily with the plaintiff's failure to provide adequate factual support for personal jurisdiction. The other case cited in support of defendants' contention is *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87 (2d Cir. 1975). The court in that case, however, merely held that the trial court did not abuse its discretion in denying discovery to establish personal jurisdiction when the allegations of jurisdictional facts were vague and conclusory. *Id.* at 94. Thus, this case supplies only tangential support for defendant's contention.

For a number of reasons, this Court finds defendants' contentions in this regard without merit. First, it would be unreasonable to demand that a plaintiff allege with specificity the defendants' contacts with the forum state before discovery has taken place. Second, the proposed rule is inconsistent with the spirit of Fed.R.Civ.P. 15 relating to amendment of pleadings. Rule 15(a) states that a party may amend his pleading as a matter of course before a responsive pleading is served. Thus, the plaintiff could have amended its complaint to allege the jurisdictional facts in more detail which would have mooted the defendants' contention. Also, Rule 15(b) provides for amendment of pleadings to conform to the evidence. There is no evidence that defendants objected to the scope of plaintiff's discovery to establish jurisdictional facts. Therefore, they implicitly consented to such amendment of the pleadings.

In any case, it would appear that the pleadings in the complaint were sufficient to notify the defendants that the plaintiff

intended to rely on b(3) and (4) providing for personal jurisdiction over a party who either "[c]auses tortious injury in the State by an act or omission in the State [or] . . . [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State." The Lanham Act violations alleged by the plaintiff are properly classified as tort claims, *United Merchants and Manufacturers, Inc. v. David & Dash, Inc.*, 439 F.Supp. 1078 (D.Md.1977), and the defendant therefore was on notice that the plaintiff might rely upon these provisions.

*What Evidence May the Court Consider in Ruling on the Motion to Dismiss.*

In addition to suggesting that the Court could only consider certain legal theories utilized by FCA to establish personal jurisdiction, the defendants have also tried to limit the submissions in support of that effort that may be considered. More specifically, defendants have filed a motion to strike certain unauthenticated documents. Defendants also urge that deposition testimony taken in another proceeding involving FCA and BankAmerica is not admissible on the jurisdiction issue.

The exhibits sought to be excluded are Attachments A through G to plaintiff's memorandum in opposition to the motion to dismiss and discovery exhibits 46, 47, and 49. The attachments include a copy of a page of the Annapolis "yellow pages" telephone directory, two BankAmerica internal reports concerning the selection and promotion of the "FinanceAmerica" trade name and service mark, BankAmerica's application to the Patent and Trademark Office to register the service mark, an excerpt from the 1979 BankAmerica Annual Report, and excerpts from depositions taken in that related proceeding. Discovery exhibit 46, which was objected to during the deposition of Mr. Browne, the Executive Vice-President of FinanceAmerica-parent, appears to be minutes of a conference between BankAmerica personnel and personnel from an advertising agency concerning selection of the name. Exhibits 47 and 49 appear to be internal BankAmerica reports concerning the selection and promotion of the FinanceAmerica name. The discovery exhibits were objected to on the ground that the deponent did not have personal knowledge of their contents. At this time, defendants object to this Court's consideration of all of the indicated documents on the ground that they are not properly authenticated. In addition, the deposition excerpts are the subject of objection because there are defendants in this case who were not parties to the earlier proceeding.

In support of its authenticity objection, the defendants cite *McLaughlin v. Copeland*, 435 F.Supp. 513 (D.Md.1977) which is apparently the only recent case on this point. In that case, Judge Blair did grant the motion to strike documents that were neither sworn or certified. *Id.* at 521, n.1. In so ruling, Judge Blair noted that "the Federal Rules of Civil Procedure do not contain prerequisites for documents appended to responses to motions to dismiss. Rule 56(e), which courts have used in judging affidavits on Rule 12(b) motions, provides guidance for this Court in viewing the documents here. . . . There may be cases of contested jurisdiction in which a court may properly consider unsworn or uncertified copies of documents which are not challenged by the opposing party. . . In this case, however, defendants have attacked plaintiff's documents." *Id.* (citations omitted).

The instant case is distinguishable from *McLaughlin* on the basis that defendants have not challenged the authenticity of the documents. Rather, they have attacked plaintiff's failure to comply with the methods of authentication set out in Federal Rules of Evidence 901. Those methods, however, are merely illustrations, and not limitations upon the manner in which documents may be authenticated. The general rule is that "[t]he requirement of authentication or identification as a condition prece-

dent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement, if it applies in this context, is satisfied by defendants' failure to challenge the documents' authenticity and by the affidavit of Alfred H. Moses, the attorney who represented FCA in the related registration proceeding. This affidavit which was filed with the plaintiff's opposition to the motion to strike, provides whatever extrinsic evidence of authenticity that might be required.

■ The only other objection requiring consideration is defendants' contention that the deposition excerpts are inadmissible because there are new parties in this action who were not parties in the registration proceeding and because different issues are present. In support of this argument, defendants cite *First National Bank v. National Airlines*, 22 F.R.D. 46 (S.D.N.Y.1958). The decision to exclude the depositions in that case, however, was made in a different procedural context. The plaintiff was seeking at trial to have deposition testimony admitted only against the defendant who was a party in the prior case and not against the new defendant. In excluding the deposition testimony, the difficulty of providing appropriate and effective limiting instructions to the jury was a substantial factor in the court's decision. That consideration is obviously not present in this case. In addition, the cited case was decided before the Federal Rules of Evidence were promulgated. Under Rule 801, hearsay is defined so as not to encompass admissions by party-opponents. Therefore, there are no grounds upon which to exclude the evidence as it pertains to BankAmerica. A more difficult problem is presented with respect to consideration of the deposition testimony in deciding the jurisdictional issues raised by the other defendants. Plaintiff suggests initially that the requirements of the Federal Rules need not be satisfied when the evidence is being used for the limited purpose of establishing personal jurisdiction. This contention is compelling, at least in instances where the reliability of the evidence is not disputed. Plaintiff also

suggests that the deposition excerpt should be characterized as "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" within the meaning of Rule 801. Application of this rule, however, necessarily would be interwoven with the merits of the jurisdictional dispute since plaintiff relies in part upon a conspiracy theory to establish jurisdiction. Out of an overabundance of caution, then, this Court will not consider the deposition excerpts as they pertain to FinanceAmerica-parent and FinanceAmerica Private Brands.

*This Court Has Personal Jurisdiction over FinanceAmerica Private Brands.*

■ Defendant FinanceAmerica Private Brands is a corporation incorporated and headquartered in Pennsylvania. It is not qualified to do business in Maryland. Nevertheless, an examination of its contacts with the state indicates that it is subject to this Court's personal jurisdiction.

Defendant FinanceAmerica Private Brands is engaged in the business of supplying financing to customers of manufacturers. There are 56 such accounts in Maryland served by this defendant. Before a contract is entered into, FinanceAmerica Private Brands investigates the credit situations of potential borrowers. After a contract is entered into, FinanceAmerica Private Brands automatically finances any purchase made by the retailer from the manufacturer. FinanceAmerica Private Brands retains a security interest in the merchandise. Most importantly, an employee of FinanceAmerica Private Brands routinely audits the inventories of the borrowers to ensure that the merchandise is actually in their possession.

In enacting the Maryland Long-Arm Statute, the Legislature sought to expand jurisdiction "to the boundaries of permissible constitutional limits." *Harris v. Arlen Properties, Inc.*, 256 Md. 185, 195–96, 260 A.2d 22, 27 (1969). As the contacts with the state in this case are substantially more significant than those found to satisfy the

demands of due process in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), this Court may constitutionally assert personal jurisdiction over this defendant. As the Supreme Court noted in very similar circumstances in the landmark case of *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945), it is significant that defendant's contacts with Maryland "were neither irregular nor casual [but] . . . were systematic and continuous . . . ." Moreover, the activities of FinanceAmerica Private Brands' employee in Maryland "resulted in a large volume of interstate business, in the course of which [this defendant] received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights." This factor is of particular importance in the case at hand where the defendant maintained a security interest in the merchandise financed and would have to resort to Maryland courts to protect those interests. Finally, it is significant that plaintiff's claim arises out of defendant's activities in the state. *Id.* at 319, 66 S.Ct. at 159. Section 6–103(a) codifies this requirement.

FinanceAmerica Private Brands has made a number of arguments supporting its position that this Court may not properly obtain personal jurisdiction over it. It places principal reliance on Judge Thomsen's opinion in *Piracci v. New York City Employees' Retirement System*, 321 F.Supp. 1067 (D.Md.1971). This case involved an action for specific performance of a mortgage agreement. The prospective mortgagee's contacts with Maryland consisted solely of three occasions on which its agents visited Maryland to inspect the property. *Id.* at 1068. In ruling that these contacts were not sufficient to establish the court's personal jurisdiction, the court emphasized that the cause of action was unrelated to the activities of the inspectors. *Id.* at 1072. FinanceAmerica Private Brands has made an analogous argument in this case. The parties agree that the central element of an infringement claim is the "passing off," *i. e.*, the purchase of services by consumers confused as to the identity of the seller. The issue, then, is whether the defendant's contacts in Maryland are sufficiently connected with the cause of action alleged. Unlike most tort suits which focus on a discrete set of identifiable actions, it would appear that infringement could be the result of a continuing and multi-faceted course of conduct. In this case, the contacts between the defendant's Maryland employee and the Maryland borrowers were apparently the bulk of the personal contacts that occurred between the borrowers and the defendant. This is because defendant did not solicit these loans directly but through the manufacturers who sold the merchandise to the borrowers. Credit checks and acceptance of proposed contracts to provide financing were handled through the mail. Thus, any passing off that might have occurred could be partially the result of this employee's activities.

Even if the requirement of § 6–103(a) is not satisfied so that jurisdiction cannot be based on (b)(1) or (3), it would appear that there is personal jurisdiction under (b)(4). Under this provision, an alleged tortfeasor may be sued in Maryland "if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from . . . services . . . used . . . in the State" even if the act causing the injury took place outside the state. Judge Miller, in *Carter v. Massey*, 436 F.Supp. 29, 33 (D.Md.1977), articulated the factors relevant to this inquiry:

1. The nature and quality of the defendants' contacts with the forum state;

2. The quantity of defendants' contacts with the forum state;

3. The relationship, if any, of the cause of action to the contacts of the defendants with the forum state; and, to a lesser extent,

4. The legitimacy of the interest of the forum state in providing a forum for the cause of action asserted, and

5. The convenience of the parties.

■ As detailed above, FinanceAmerica Private Brands provides financing to a significant number of borrowers in Maryland. Defendant, however, discounts the significance of that activity by pointing to the fact that the contracts are accepted in Pennsylvania rather than in Maryland. This fact, however, is not critical. *See International Shoe, supra,* at 313, 66 S.Ct. at 156; *Harris, supra,* 256 Md. at 198, 260 A.2d 22. Defendant also emphasizes the fact that its employee has responsibility for a number of states and resides in Maryland voluntarily. The Supreme Court in *International Shoe, supra,* at 313, 78 S.Ct. at 156, did note that the salesmen who represented the defendant did reside in Washington; no mention, however, is made of whether such residence was voluntary or required by the employer. This factor, however, does not seem significant in light of the substantial revenue received by the defendant out of its contacts with Maryland.

■ The last two factors mentioned above also militate in favor of this Court's conclusion that it has personal jurisdiction over defendant FinanceAmerica Private Brands. Defendant relies upon the fact that the plaintiff was incorporated in Delaware rather than Maryland to support its assertion that Maryland does not have a legitimate interest in providing a forum for the cause of action asserted. The Lanham Act and the corresponding state statute, Md.Ann.Code Art. 41, § 101 protect the interests not only of those who own and use registered trade names and service marks, but also of those consumers who rely upon such representation in purchasing goods or services. Thus, as both parties have customers who reside in the state, Maryland has an interest in providing a forum for the instant dispute. The last factor mentioned is the convenience of the parties. In this regard, it should be noted that this defendant's headquarters are located well within two hundred miles of Baltimore. Thus, subjecting this defendant to this Court's personal jurisdiction does not amount to a severe inconvenience.

*This Court Has Personal Jurisdiction over FinanceAmerica-parent.*

In support of its motion to dismiss, defendant FinanceAmerica-parent has submitted the affidavit of William J. Fenza, the Senior Vice-President and General Counsel of FinanceAmerica Corporation. In this affidavit, Fenza states that this defendant "has no office or other place of business in Maryland, it owns no property in Maryland, none of its employees live in Maryland, nor does it transact any business or perform any financial services in Maryland." According to Fenza, "FinanceAmerica Corporation is a holding company, the activities of which are limited to its investment in its numerous operating subsidiaries incorporated in and/or qualified to do business in all fifty states  .  .  ..." Two of the subsidiaries owned wholly by this defendant are defendants FinanceAmerica Private Brands and FinanceAmerica-Maryland.

Plaintiff contends that FinanceAmerica-parent is subject to this Court's jurisdiction by virtue of the activities in which it engages directly and through its subsidiaries. FinanceAmerica-parent, however, contends that this Court cannot attribute the activities of FinanceAmerica-Maryland to it in deciding the jurisdictional issue. Before resolving this dispute, however, it is necessary to determine the proper analytic framework.

The defendant contends that this Court cannot consider the activities of the subsidiary without piercing the corporate veil and that the facts of the instant case do not warrant such judicial action. In support of this position, the defendant cites *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). In that case, the Supreme Court refused to pierce the corporate veil for jurisdictional purposes. In so holding, the Court described the relationship between the parent corporation and the subsidiary as follows:

> The Alabama corporation, which has an office in North Carolina, is the instrumentality employed to market Cudahy

products within the State; but it does not do so as defendant's agent. It buys from the defendant and sells to dealers. In fulfilment of such contracts to sell, goods packed by the defendant in Iowa are shipped direct to dealers; and from them the Alabama corporation collects the purchase price. Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other States. The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general Cudahy business was doubtless adopted solely to secure to the defendant some advantage under the local laws.

Maryland courts appear to follow *Cannon*. In *Vitro Electronics v. Milgray Electronics, Inc.*, 255 Md. 498, 258 A.2d 749 (1969), the court refused to pierce the corporate veil in a situation where the parent and the subsidiary "maintained separate corporate books, separate minutes, separate records, and separate and distinct accounting procedures, and held separate directors' meetings." *Id.* at 500, 258 A.2d at 751. In addition, the court noted that the subsidiary "was not . . . engaged in doing public relations work or publicity for the parent company in the forum state." *Id.* at 504, 258 A.2d at 752. The court commented upon the trend towards liberalization of the requirements for holding foreign corporations subject to personal jurisdiction based on the activities of their subsidiaries, but declined to follow it. It stated "we are not prepared to adopt a doctrine which . . . would have the effect of breaking down

observed distinctions between parent and subsidiary corporations, where fraud or deception is not present . . . ." It is significant, however, that the court in *Vitro Electronics* remanded the case for a determination by the trial court of whether the parent corporation had committed a tortious act in Maryland which would subject it to the court's personal jurisdiction by issuing a certificate of compliance with federal standards for the merchandise that was the subject of the contractual dispute.

That the strict rule endorsed by the court in *Vitro Electronics, supra,* may not be rigidly adhered to in Maryland is apparent from an examination of the court's opinion in *Harris, supra.* In this case, the court observed that "in order to hold the corporate veil inviolate, at least insofar as jurisdiction is concerned, it is necessary as a factual matter that a corporation have some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Id.* 256 Md. at 200, 260 A.2d at 29. In this case, the court found that "the sole purpose for the corporate existence of [the corporation] is to hold title to real estate for the benefit of [the partnership] . . . ." *Id.* at 201, 260 A.2d at 30. This purpose did not satisfy the "independent reason" requirement.

As will be evident from the discussion of the relationship between FinanceAmerica-parent and FinanceAmerica-Maryland that follows, this Court is presented with a factual situation falling between the two extremes represented by *Vitro Electronics, supra,* and *Harris, supra.* It is therefore necessary to look elsewhere for guidance.

As the defendant points out, the Fourth Circuit followed *Cannon*, albeit reluctantly, in *Harris v. Deere and Co.*, 223 F.2d 161 (4th Cir. 1955). The defendant challenging the court's jurisdiction in this case was a manufacturer of agricultural equipment. Its wholly owned subsidiary, which was doing business in North Carolina, the forum state, distributed the machinery to dealers. In addition to having similar names, the

parent and subsidiary corporations also had interlocking directorates and common officers. The court conceded that the parent controlled the subsidiary completely. It followed the formalistic approach in *Cannon, supra*, and emphasized the district court's findings that the corporations "have their own separate employed personnel, kept separate books and accounts and file separate federal income tax returns." *Id.* at 162. From these factors, the court concluded that the corporate veil could not be pierced. The Fourth Circuit did note, however, that "[m]uch can be said in support of the view that a manufacturer which distributes its product by selling it to a wholly owned and completely controlled subsidiary should, for purposes of jurisdiction in the courts, be held to be doing business wherever the subsidiary sells the product. The fiction of different corporate entities ought not permit the manufacturer, in such case, to avoid suit in the states where its product is being sold and where the wholly owned and controlled subsidiary is representing it just as truly as if it were an agent in the legal sense; and we would so hold if we felt ourselves at liberty to do so."

The Fourth Circuit continued to follow *Cannon* in *Manville Boiler Co. v. Columbia Boiler Co.*, 269 F.2d 600 (4th Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959). In that case, the court upheld the dismissal of a parent corporation on the grounds of improper venue. It noted that the wholly owned subsidiary was "extensively controlled" by the parent corporation, but felt compelled to reach this result because the corporations maintained separate records. *Id.* at 606. *See also Shapiro v. Ford Motor Co.*, 359 F.Supp. 350, 355 (D.Md. 1973).

More recent cases, however, evidence a definite shift away from the formalistic approach of *Cannon, supra*. In *Penntube Plastics Co. v. Fluorotex, Inc.*, 336 F.Supp. 698 (D.S.C. 1971), for example, the court, in applying the venue statute, focused not only on the degree to which separate accounting records were kept, but also on the degree to which the operations of the parent and subsidiary corporations were integrated. Significant factors, in the court's view, included the extent to which the parent corporation controlled the promotion and sale of its products through the subsidiary corporation and the fact that it paid the operating expenses of the subsidiary and contributed to the compensation of its sole full time employee. The court noted further that the parent corporation took responsibility for making bookkeeping entries to reflect purchases and sales by the subsidiary. The fact that the President and chief executive of the parent corporation also served as the Chairman of the subsidiary was also mentioned. The court concluded, that "[t]he separate corporate status, if any, of Fluorotex can and should be disregarded under the present facts, and the Court feels fully justified in piercing the corporate shield."

The trend towards a more functional approach to the problem of subjecting a parent corporation to the court's jurisdiction based on the activities of its subsidiaries was continued in *Lee v. Walworth Valve*, 482 F.2d 297 (4th Cir. 1973). In that case, the parent corporation and its two wholly owned subsidiaries manufactured valves for which salesmen solicited orders in the forum state. In discussing the substantiality of the parent corporation's contacts with the forum state, the court noted that "[d]uring oral argument, Walworth urged that we ignore the activities of Walworth's two wholly owned subsidiaries. . . . [*Cannon*] held only that the presence of an independent subsidiary could not be equated with the presence of the parent. Here, the activity in South Carolina appears to have been joint. There is no indication in the record that any salesman represented only one of the corporations involved. From all that appears, each was authorized to solicit orders for the three related corporations, which, incidentally, filed consolidated tax returns."

Thus, it appears that the Fourth Circuit has abandoned, *sub silentio*, the formalistic inquiry required by *Cannon* in favor of a minimum contacts analysis. This conclusion is bolstered by an examination of two

very inciteful recent district court opinions in this Circuit. In *Fieldcrest Mills, Inc. v. Mohasco Corp.*, 442 F.Supp. 424 (M.D.N.C. 1977), the court distinguished the Fourth Circuit's decision in *Harris v. Deere and Co.*, *supra*, on the grounds that the earlier decision involved application of a "doing business" jurisdictional test which was then in force in North Carolina as opposed to the "minimum contacts" inquiry which was then statutorily mandated. 442 F.Supp. 430. In so ruling, the court noted that "[r]ejection of the *Cannon* rule does not mean that in all cases the acts of a subsidiary corporation will be attributed to the parent corporation for the purposes of establishing jurisdiction over the parent. Even under the minimum contacts test, the mere fact of stock ownership is not sufficient to bring the parent within the court's jurisdiction." *Id.* After noting the absence "of any developed set of standards to apply in determining what situations warrant asserting jurisdiction over a parent corporation," the court looked for guidance to application of the minimum contacts test in other factual contexts. *Id.* In particular, the court adopted the agency theory previously utilized in subjecting manufacturers to the court's personal jurisdiction on the basis of the activities of their distributors. *See, e.g., Hardy v. Pioneer Parachute Co.*, 531 F.2d 193 (4th Cir. 1976); *Szantay v. Beech Aircraft Corp.*, 349 F.2d 60 (4th Cir. 1965). In so doing, the court noted that "[i]t would be a curious circumstance if a corporation that used a subsidiary to distribute its products was less amenable to a court's jurisdiction than a manufacturer that used an unrelated corporation to distribute its products."

This rationale was also relied upon by the court in *Roorda v. Volkswagenwerk, A.G.*, 481 F.Supp. 868, 879 (D.S.C. 1979) in applying an agency theory rather than the *Cannon* test in determining whether a parent corporation was subject to the court's personal jurisdiction. The court stated that "[w]hile it is true that this court cannot identify any case from the United States Supreme Court which has specifically overruled the principle established in *Cudahy*, it

seems apparent . . . from multitudinous decisions of state and federal courts throughout the United States, that the principle announced twenty years later by the Supreme Court in *International Shoe*, *supra*, changed the older concept of jurisdiction and substantially eroded the stringent jurisdictional test applied in *Cudahy*." *Id.* (footnote omitted). *See also Sunrise Toyota Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519 (S.D.N.Y. 1972).

Implicit support for this conclusion appears in a recent Supreme Court case addressing the question of what contacts a regional distributor and a retailer of automobiles must have with the forum state before personal jurisdiction may be found. *World-Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In ruling that the trial court lacked personal jurisdiction over these defendants, the Court noted that they did not "regularly sell cars at wholesale or retail to Oklahoma customers or residents . . . [and did not] indirectly, through others, serve or seek to serve the Oklahoma market." 444 U.S. at 295, 100 S.Ct. at 566. Thus, the Supreme Court has suggested that personal jurisdiction over a foreign corporation may be properly based on the activities of its agent, albeit in a context where the defendants were "fully independent corporations whose relations with each other and with Volkswagen and Audi are contractual only." 444 U.S. at 289, 100 S.Ct. at 563. Given, however, that in so ruling the Court focused on the issue whether there were purposeful "efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product" in the forum state, the inference that the *Cannon* approach is outdated appears supportable. 444 U.S. at 297, 100 S.Ct. at 567. Additional support for this position can also be gleaned from the fact that *World-Wide Volkswagen* represented a clear departure from the restrictive approach towards jurisdiction taken in *Bank of America v. Whitney Bank*, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594 (1923). In that case, which was cited with approval in *Can-*

907

*non*, the Supreme Court rejected assertion of personal jurisdiction based on an agency theory.

In sum, this Court is convinced that the plaintiff may proceed on an agency theory to establish personal jurisdiction over the defendants. This conclusion is buttressed by the fact that this theory has been applied by Maryland courts in other contexts. *See, e.g., Lamprecht v. Piper Aircraft Corp.*, 262 Md. 126, 277 A.2d 272 (1971) (Manufacturer who utilizes middlemen for distribution of product is subject to personal jurisdiction where resale in forum state foreseeable.) A conspiracy theory of jurisdiction wherein the acts of alleged co-conspirators are attributable to the defendant challenging jurisdiction is also applicable. *McLaughlin, supra*, at 529. In applying either theory, however, the Court must find as a threshold matter that an agency relationship existed or that the defendant knew, or should have known, that his conduct would have effects in the forum state. *Id.* at 531–33. As the following discussion of the facts elicited through discovery will show, plaintiff has satisfied this burden. In addition, it will also become apparent that, at least with respect to defendant FinanceAmerica-parent, the defendant's direct contacts with the forum state exceed the required minimum.

The evidence submitted by FCA to establish FinanceAmerica-parent's control over the operations of its subsidiary, FinanceAmerica-Maryland, satisfies the threshold requirements for application of the agency theory to establish personal jurisdiction. Such control is maintained by requiring the subsidiary to obtain the parent's approval when significant decisions are made. In addition, the day-to-day operations of the subsidiary are constrained by the guidelines set forth in the operating manual prepared by FinanceAmerica-parent.

The significant decisions for which the parent's approval are required include the opening of branch offices, the negotiation and execution of leases, the making of substantial loans, and the acquisition of substantial assets. In addition, Mr. Thomas E. Dey, the Senior Vice-President of FinanceAmerica-parent sets the interest rates at which the subsidiary can lend money to customers. The parent corporation also reviews the operations of the subsidiary to ensure compliance with applicable state laws.

The conclusion that the activities of FinanceAmerica-Maryland are largely controlled by FinanceAmerica-parent is buttressed by the evidence submitted concerning the structure of the corporate heirarchy. First, it is significant that there is no FinanceAmerica-Maryland employee with statewide responsibility. Rather, there are area directors who are responsible for supervising branch managers in a multistate district. These area directors are nominally employees of the subsidiaries but report to Mr. Dey who has responsibility for supervising all of the branch offices in the eastern region. These area directors are paid by the parent corporation. The branch managers are also employed by the parent. In addition, the record shows that there is substantial overlap of corporate officers and that the duties associated with the separate positions held by officers operating in such a dual capacity are indistinguishable. Moreover, the Board of Directors of the subsidiary is comprised of the top officers of the parent. Finally, the FinanceAmerica-Maryland Board of Directors has had no meetings during the last three years.

In addition to controlling both the major decisions and day-to-day operations of the subsidiary, FinanceAmerica-parent also provides extensive support services. A review of these services supports the inference that there is personal jurisdiction based on a conspiracy theory. They include legal tax, and accounting services, as well as the provision of forms and computer systems. In addition, FinanceAmerica-Maryland personnel participate in insurance and pension plans maintained by the parent corporation. Of critical significance, however, in the context of an infringement case, is the fact that the parent supplies marketing and advertising services to the subsidiary. More specifically, FinanceAmerica-parent mar-

keting personnel assist the subsidiary in promoting its lending services. In addition, advertisements which appear in magazines distributed in Maryland are prepared by the parent corporation for the benefit of the subsidiary. These factors conclusively establish the parent's participation in the utilization of the allegedly infringing trade name and service mark.

In support of its motion to dismiss, defendant FinanceAmerica-parent has pointed to the undisputed fact that subsidiaries are charged for the support services provided. Given that *Cannon's* formalistic approach is not the appropriate analysis, this fact is not significant. Even under the *Cannon* approach, however, it appears that the corporations' finances are not rigidly separated. For example, while it is true that the subsidiaries are charged for services provided by the parent, this is not done on the basis of the actual services provided. Rather, the parent corporation allocates a pro-rata share of the costs of services provided to subsidiaries to each subsidiary. In addition, bonuses awarded to branches with outstanding records are paid for by similarly allocating the costs among the subsidiaries. Finally, one bank account is maintained for all FinanceAmerica subsidiaries, and there are instances of funds being transferred between branches located in different states without the benefit of intercorporate agreements.

In sum, it appears that the operations of the parent and subsidiary are sufficiently integrated to justify piercing the corporate veil even if the *Cannon* standard is utilized. Even if the acts of the subsidiary are not attributed to the parent, however, it is evident that the parent has sufficient direct contacts with the forum state to justify this Court's exercise of personal jurisdiction. This conclusion is based in large part upon FinanceAmerica's role in preparing advertisements which appear in publications distributed in Maryland. Similar contacts supported personal jurisdiction in *Fieldcrest Mills, supra,* at 427. In that case, which involved claims of fraudulent misrepresentation and breach of warranty, the court commented upon the close nexus between the defendant's contacts and the cause of action. *Id.* at 428. In the instant dispurt, there is a similarly close connection between the contacts and the claimed misrepresentation. Therefore, there appears to be personal jurisdiction over defendant FinanceAmerica under both § (b)(1) and (b)(3) of the Long Arm Statute.

The previous conclusion with respect to (b)(3), however, rests upon the premise that the acts causing the tortious injury took place in Maryland. *See Zinz v. Evans & Mitchell Industries,* 22 Md.App. 126, 324 A.2d 140, *cert. denied,* 272 Md. 751 (1974). Analogizing from that case, which involved a libel claim, it is apparent that the acts are considered to have taken place where the preparation and placement of the advertisements took place and not where they were published. *See also United Merchants, supra.* As the record is unclear concerning the geographical location of the advertising and marketing services provided by the parent corporation, this Court must look to (b)(4). Finding that the supervision of and provision of support services to the subsidiary coupled with the activities of the branch managers and area directors, constitutes a "persistent course of conduct in the State" within the meaning of that section, this Court is satisfied that the defendant FinanceAmerica both directly and through an agent has engaged in activities in the forum state which subject it to personal jurisdiction under (b)(1) and (b)(4).

*This Court Has Jurisdiction Over Defendant BankAmerica.*

Although defendant BankAmerica's contacts with the forum state are more attenuated than those of FinanceAmerica, they are still sufficient to satisfy the requirements of due process. These contacts fall into two categories: the marketing of BankAmerica travelers checks; and the selection and promotion of the FinanceAmerica trade name and service mark.

The first category of contacts are relevant to personal jurisdiction under (b)(4). The record establishes that this defendant was responsible for purchasing

GAC Finance, Inc. and for selecting a new name and service mark. BankAmerica was also the party who attempted to register this name and mark with the United States Patent and Trademark Office. These activities constitute acts allegedly causing tortious injury within the meaning of (b)(4). The inquiry then is whether this defendant "regularly does . . . business or engages in any other persistent course of conduct in the State."

Defendant contends that this Court may not take into account defendant's activities in the traveler's check market because those activities are not connected with the instant case. That contention, however, is erroneous; no such connection is required. *Carter v. Massey, supra,* 436 F.Supp. at 32.

■ In his deposition, Peter M. Nelson, a Senior Vice-President of BankAmerica, testified that BankAmerica travelers checks are sold in every state, including Maryland. On their face, the checks state that "BankAmerica Corporation . . . will pay this cheque . . . ." According to Nelson, the checks are issued through "a selling agent, *i.e.,* another bank." That agent, however, is not the obligor. The checks are also imprinted with the statement "Payable through Bank of America NT & SA," another BankAmerica subsidiary, who is also not an obligor. In support of its motion to dismiss, defendant relies upon the fact that the checks are marketed through BA Cheque Corporation, another subsidiary which allegedly does not do business in Maryland. Given, however, that BankAmerica is the obligor, it is apparent that the other entities involved in the distribution of the travelers checks are acting in an agency capacity, thus justifying this Court's attribution of those activities to this defendant for jurisdictional purposes.

■ Jurisdiction in this case also can be grounded upon a conspiracy theory. Defendant's contention that related corporations cannot be held to conspire is without merit. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968). As mentioned above, this defendant

is responsible for selecting the allegedly infringing name. The record also establishes that this defendant was intimately involved in the design of a promotional campaign aimed at introducing consumers to FinanceAmerica. Although the parent-subsidiary relationship between BankAmerica and FinanceAmerica-parent is not as symbiotic as that between FinanceAmerica-parent and FinanceAmerica-Maryland, it is sufficiently integrated to support an inference that there was an agreement and cooperative efforts involving this defendant and its subsidiary and sub-subsidiaries to promote consumer finance services through the use of the allegedly infringing name. For example, FinanceAmerica-parent uses the name and mark without a licensing agreement or compensation, even though BankAmerica owns them. In addition, the allegedly infringing name is used in connection with FinanceAmerica-Maryland in conjunction with the BankAmerica logo in order to merchandise the affiliation. The record establishes that this was considered to be a practice of mutual benefit. In addition, FinanceAmerica-parent routinely advises the parent of significant decisions concerning advertising strategy. BankAmerica, in turn, must approve the annual operating plan of its subsidiary.

*Venue in this District is Proper.*

The venue inquiry is governed by 28 U.S.C. § 1391(b) and (c). Section 1391(b) provides that a federal question case "may be brought only in the judicial district where all defendants reside, or in which the claim arose . . . ." Residence for venue purposes is determined under (c) which states that "[a] corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation . . . ."

■ Initially, it should be noted that a majority of courts have held that the burden is on the plaintiff to establish that venue is proper. *See, e.g., Besuner v. Fa-*

*berge, Inc.*, 379 F.Supp. 278 (N.D.Ohio 1974); *Ryan v. Glenn*, 52 F.R.D. 185 (N.D. Miss. 1971). In determining whether a corporation is doing business, a federal standard applies. It is appropriate, however, to inquire, in applying such a standard, whether the contacts of the defendant with the forum state are such as would require a license to do business in the state. It is also significant whether the operation of the defendant is localized. *Trinity Metals v. Andy International, Inc.*, 424 F.Supp. 966 (E.D.Pa. 1977). Because the "doing business" test is not identical to the minimum contacts jurisdictional standard, subsidiaries' activities are not attributable to the parent corporation. *Papercraft Corp. v. Procter & Gamble Co.*, 439 F.Supp. 1060, 1063 (W.D.Pa. 1977). From the record, it is apparent that neither BankAmerica nor FinanceAmerica-parent are "doing business" in Maryland within the meaning of the statute. The question then arises whether the claim arose within this district, as the residency requirements do not apply in that case. *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 890 (S.D. N.Y. 1974).

In interpreting this provision of the venue statute, it is important to note that the underlying purpose was to permit the resolution of a dispute in one suit where there are multiple defendants from different states. *Transamerica Corp. v. Transfer Planning, Inc.*, 419 F.Supp. 1261 (S.D.N.Y. 1976). In infringement cases, the claim is considered to arise where the passing off occurs. *Id.* at 1262; *cf. Quinn v. Bowmar Publishing Co.*, 445 F.Supp. 780, 783 (D.Md. 1978). Of course, where the allegedly infringing name is used on a nationwide basis, passing off may occur in every district. In such an instance, the appropriate test is whether "significant sales causing substantial injury were made in the district in which venue is asserted, or some other overt act constituting a significant and substantial element of the offense occurred there." *Id.* Given the substantial nature of plaintiff's contacts with the forum state, as well as the significant amount of business transacted by FinanceAmerica-Maryland, it is apparent that this requirement is satisfied in the instant case.

Accordingly, it is this 1st day of July, 1980, by the United States District Court for the District of Maryland, ORDERED:

1. That the defendants' motion to dismiss be, and the same is, hereby DENIED; and

2. That copies of this Memorandum and Order be mailed to all counsel.